UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| A.E. BY AND THROUGH HIS PARENTS AND NEXT FRIENDS, MR. AND MRS. E., Plaintiff,<br><br>v.<br><br>WESTPORT BOARD OF EDUCATION, Defendant. | CIVIL ACTION NO. 3:05cv705 (SRU) |

## MEMORANDUM OF DECISION

The plaintiff, A.E., is a minor child who brings this lawsuit individually and through his parents and next friends, Mr. and Mrs. E. During his elementary school years, A.E. experienced behavioral problems, due, in part, to his bipolar condition. When A.E. finished seventh grade, defendant Westport Board of Education (the "Board"), with the parents' participation, drafted an individualized education plan ("IEP") that proposed placing A.E. at Cooperative Education Services ("CES"), a public school for children with various behavioral problems. A.E.'s parents disagreed with the Board's placement and instead sent him the Woodhouse Academy, a private school. Pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., the parents requested a due process hearing. At the hearing, the parents argued that the Board's decision to place A.E. at CES denied him a free and appropriate public education ("FAPE"), and sought to be reimbursed for private school expenses.

The hearing officer found that A.E. would have received a FAPE at CES and denied the parents any reimbursement for A.E.'s private education. A.E. now appeals the hearing officer's decision. Both parties have moved for judgment on the administrative record. For reasons that follow, I conclude that A.E. would have received a FAPE at CES. Accordingly, plaintiff's motion for judgment on the administrative record is DENIED, and defendant's motion for

judgment on the administrative record is GRANTED.

I.      **Factual and Procedural Background**

Most of the facts relevant to this decision are undisputed.  At the time A.E. commenced this lawsuit, he was a thirteen years old.  From kindergarten through fifth grade, A.E. attended Coleytown Elementary School, a Westport public school.  Although he had no academic difficulties, he experienced increasing behavioral problems.  Several times during his years at Coleytown, representatives from the public school system recommended to A.E.'s parents that A.E. undergo a full battery of psycho-educational testing to determine whether special education would be appropriate.  A.E.'s parents initially refused, but eventually agreed to allow Dr. Armin Thies, an independent doctor, to perform a neuropsychological evaluation of A.E.  In December 2001, during his fifth grade year, Thies examined A.E. and found that he was eligible for special education and related services because he had a serious emotional disturbance ("SED").  On February 28, 2002, the planning and placement team ("PPT") reviewed Thies' evaluation and found the student eligible for special education.

On April 11, 2002 the parents and school representatives participated in a PPT meeting in which they determined that A.E. should attend Coleytown Middle School for sixth grade.  A.E. did not adjust well to Coleytown Middle School, however, and the after another PPT meeting on October 21, 2002 A.E.'s parents consented to the PPT's recommendation that A.E. be transferred to Loraine D. Foster Day School ("LDFDS"), a state approved special education day school in Hamden, Connecticut.  A.E. completed sixth and seventh grades at LDFDS.  Although his behavioral problems continued at LDFDS, A.E. made substantial progress.  He received good grades and was "student of the week" for three consecutive weeks in January 2004.  In the spring

of 2004, however, A.E.'s parents approached Peggy Bud, the Westport Board of Education's coordinator of special education for private school placements, to request that A.E. be transferred because they believed LDFDS was no longer sufficiently challenging, and because they began having conflicts with LDFDS's executive director.

On April 13, 2004, the parties attended a PPT meeting to formally discuss A.E.'s parents' transfer request. Noreen O'Mahoney, a parent advocate, represented A.E.'s parents at that meeting and at all subsequent PPT meetings. The Board suggested that A.E. undergo another psychiatric evaluation by Dr. G. Davis Gammon and the parents gave their consent. The parties agreed to reconvene to discuss Dr. Gammon's evaluation and to draft A.E.'s IEP. At some time before the next PPT meeting, Bud suggested that the parents review several school programs including Hall-Brooke, Cedarhurst and CES. Also before the next PPT meeting, A.E.'s parents wrote a letter to Bud that stated, "[b]ased on your recent suggestion, we reviewed the school programs at Hall-Brooke (Seton Academy) and Cedarhurst Academy . . . [and we are] already familiar with the therapeutic programs offered by Coperative Education Services (CES). . . . [W]e conclude that none of these three programs would provide [A.E.] with a free appropriate public education (FAPE)." Admin. Hearing E. B-211 at 1. In that letter, the parents asserted that Woodhouse Academy was the "appropriate school placement for A.E." *Id.*

On June 8, 2004, the parties met to discuss Dr. Gammon's findings and to develop an IEP. Dr. Gammon diagnosed A.E. with Communication Disorder NOS, Learning Disorder NOS, Bipolar Disorder NOS, Attention Deficit Hyperactivity Disorder, and Oppositional Defiant Disorder. Dr. Gammon commented that A.E. required special education in a therapeutic day school. A.E.'s parents agreed that A.E. required placement at a therapeutic day program. Dr.

Gammon further commented that CES, a regional special education public school in Trumbull for children who present a variety of emotional and behavioral difficulties, had worked well for other patients with conditions similar to A.E.'s.

At the June 8, 2004 meeting, the Board proposed an IEP. A.E.'s parents did not agree with the IEP, however, so the parties agreed to reconvene to discuss A.E.'s parents' proposals for revised goals and objectives. The Board also recommended that A.E. be placed at CES for the upcoming school year. The parents did not consent to that placement decision.

On June 22, 2004, the parties again reconvened to revise the IEP goals. The Board adopted several of the parents' suggested changes. The parents nevertheless disagreed with the IEP and sent a July 31, 2004 letter to the Board in which they enclosed their own proposed IEP. The parents' proposed IEP, as their counsel conceded during the hearing on the instant motions, is substantially similar to the Board's IEP as revised June 22, 2004.

After the Board received the parents' letter and counter-proposal, Bud responded:

> I and the other Westport members of the PPT have spent numerous hours reviewing the proposals previously presented by you and your advocate, Noreen O'Mahoney, and discussing those proposals in PPT meetings. We do not appear to be any closer to reaching consensus on the wording of the IEP goals and objectives for all of these discussions. If you would like to have another PPT meeting to review your latest proposed IEP, I will consider scheduling another meeting for this purpose. Otherwise, I can simply add this document to A.E.'s file as a record of your request. Please let me know whether or not you are requesting a PPT meeting for further discussion of the IEP so that I can properly evaluate your request.

Admin. Hearing Ex. B-224. A.E.'s parents never requested, nor did the Board organize, an additional PPT meeting. A.E.'s parents sent A.E. to Woodhouse Academy for the 2004-2005 school year and requested a due process hearing pursuant to the IDEA to recoup the private

school costs.

      Central to the issues presented for review is CES' ability to meet A.E.'s educational needs as defined in A.E.'s IEP. CES is a 115-student regional public school dedicated to educating children with emotional and behavioral difficulties and preparing students to return to a public school within their local school districts. It has eighteen classrooms and serves students from kindergarten through twelfth grade. Classes are no larger than eight students and the teachers are certified special education teachers. CES also has the full complement of necessary personnel, including social workers, psychologists, counselors, physical therapists, occupational therapists, speech and language pathologists, and a school nurse. The psychologists are qualified to conduct Functional Behavioral Assessments, and train the staff in behavioral intervention techniques. CES has a specific social skills curriculum and uses behavior intervention techniques that are specifically tailored to students with SED, including the point-and-level feedback systems, physical management techniques, time out areas, "take space" areas in classrooms, and counseling by experienced staff. All students receive both individual and group counseling in accordance with their IEPs. Of the 115 students at CES, 25 are diagnosed bipolar.

      A.E.'s parents nevertheless initiated a due process hearing in which they argued that the Board committed several procedural violations during the IEP drafting process, and that by placing A.E. at CES, the Board did not provide A.E. a FAPE. The parties bitterly litigated the dispute during an eleven-day due process hearing before Attorney Patricia M. Strong, Hearing Officer for the Connecticut Department of Education. The record of those proceedings, the briefing at the due process hearing, and the briefing in this court are voluminous. Both parties presented expert testimony to support their positions. In her decision of March 17, 2005, Strong

found that: (1) the parents failed to raise any procedural violations until their post-trial brief and thus waived them, and even if they had properly raised the procedural violations, no violations occurred, and even if violations had occurred, they were not sufficiently serious to deprive A.E. of a FAPE; and (2) CES was appropriate for A.E.  Because Strong found that A.E.'s placement at CES provided him a FAPE, she did not reach the question whether Woodhouse would have been appropriate.

The parents now appeal Strong's decision on five grounds: (1) the hearing officer never explicitly found placement at CES to be appropriate for A.E. and could not so find; (2) the hearing officer erroneously found the existence of an IEP in June 2004 despite the fact that no such document was ever developed; (3) the Board predetermined A.E.'s placement at CES, prior to drafting an IEP and with no consideration of the views of the parents; (4) Woodhouse Academy was an appropriate placement for A.E. for the 2004-2005 school year; and (5) the hearing officer made numerous findings of fact that were either contradicted or not supported by the record.  Plaintiff's Motion for Summary Judgment p. 1.

**II.     Standard of Review**

Courts that decide summary judgment motions on IDEA appeals are "not dealing with summary judgment in its traditional setting."  *Wall by Wall v. Mattituck-Cutchogue Sch. Dist.*, 945 F. Supp. 501, 508 (E.D.N.Y. 1996).  Summary judgment in IDEA actions is "the most pragmatic procedural mechanism" for resolving IDEA actions.  *Id*.  When deciding a summary judgment motion in the IDEA context, a court's inquiry is not directed to discerning whether there are disputed issues of fact, but rather whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that

the child's educational needs have been appropriately addressed. *Id*. Therefore, "it matters not, in this context, who initiates the motion." *Id*. In this case, neither party submitted any additional evidence outside of the administrative record.

A district court conducts an independent, but deferential review of a hearing officer's decision in an IDEA case. The IDEA's statutory scheme requires "substantial deference to state administrative bodies on matters of educational policy." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir. 2005). The Supreme Court has cautioned that courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Board of Education v. Rowley*, 458 U.S. 176, 206 (U.S. 1982). Although courts should not "simply rubber stamp administrative decisions," they should give "due weight" to these proceedings and be mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy. *Cerra*, 427 F.3d at 191-192 . "Deference is particularly appropriate when, as here, the state hearing officer's review has been thorough and careful." *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998).

**III.    Discussion**

To receive federal funding under the IDEA, a state must, among other things, provide all children with disabilities with a "free appropriate public education." 20 U.S.C. § 1412(a)(1)(A). When a state that receives IDEA funding fails to give a disabled child such an education, the child's parent may remove the child to an appropriate private school and then seek retroactive tuition reimbursement from the state. *Cerra*, 427 F.3d at 192. Nevertheless, parents who unilaterally change their child's placement during the pendency of review proceedings, without

the consent of school officials, "do so at their own financial risk." *Florence County School Dist. Four v. Carter By and Through Carter*, 510 U.S. 7, 15 (1993). Those parents are entitled to reimbursement only if a federal court concludes "both that the public placement violated IDEA and that the private school placement was proper under the Act." *Id*.

There is a three-step process to determine whether parents who challenge a proposed IEP under the IDEA are entitled to private school tuition reimbursement. The first two steps focus on whether the proposed IEP "was inadequate to afford the child an appropriate public education." *Cerra*, 427 F.3d at 192. First, courts must examine whether the state has complied with the procedures set forth in the IDEA. Second, courts must consider whether the IEP that the parties developed through the IDEA's procedures is reasonably calculated to enable the child to receive educational benefits. *Id*. Only if the the IEP is procedurally or substantively deficient will a court proceed to the third step and ask whether the private schooling obtained by the parents is appropriate to the child's needs. *Id*.

A.  <u>Did the Board Comply With IDEA's Procedural Requirements?</u>

A.E. first raised a procedural violation claim in his post-hearing brief. Consequently, the procedural claims were waived. *See A.S. v. Board of Education*, 245 F. Supp. 2d 417, 426 (D. Conn. 2001) (upholding a hearing officer's dismissal of an issue that the plaintiff raised in a post-hearing brief but did not raise before the hearing because "[s]uch a requirement is consistent with, and parallel to, the IDEA requirement that available administrative remedies be exhausted before a special education claim is brought to court"); *see also T. ex rel. C.T. v. Lewiston School Comm.*, 2000 U.S. Dist. LEXIS 10674 (D. Me. 2000) (holding various issues could be waived because they were not raised in the administrative proceedings). Even if A.E.'s procedural

claims were not waived, they are without merit.

A school board complies with the IDEA's procedural obligations if the board afford parents of a child with a disability an adequate opportunity to participate in the development of the student's IEP. *Cerra*, 427 F.3d at 192. Specifically, the IDEA requires a board to allow the parents "to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child and the provision of a FAPE to such child." 20 U.S.C. § 1415(b)(1). The IDEA further requires a board to allow parents "to obtain an independent evaluation of the child." *Id*. Finally, the IDEA requires a board to permit parents "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A). When such a complaint is presented, the parents "shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency." 20 U.S.C. § 1415(f)(1)(A). The regulations provide: "Each public agency must take steps to ensure that one or both of the parents of a child with a disability are present at each IEP Team meeting or are afforded the opportunity to participate." 34 C.F.R. § 300.322. Procedural flaws alone do not automatically require a court to find that a board denied a student a FAPE. Procedural flaws that result in the loss of educational opportunity, or that seriously infringe the parents' opportunity to participate in the IEP formulation process, however, "clearly result in the denial of a FAPE." *W.A. v. Pascarella*, 153 F. Supp. 2d 144, 153 (D. Conn. 2001)

A.E.'s parents argue that the Board violated the IDEA's procedural requirements in two ways. First, the parents argue that the Board never developed an IEP for A.E. in the first

instance. Second, the parents argue that the Board predetermined the recommendation that A.E. should attend CES before the parents were allowed to participate in the June 8 and June 22 meetings, and in fact made the recommendation before developing A.E.'s IEP.

The Board first developed an IEP for A.E. at the June 8, 2004 PPT meeting. Solely at the parents' request, the Board met and revised the IEP at the June 22, 2004 PPT meeting. Both of the IEP's were legally sufficient, despite the fact that the parents did not agree with the content. Nothing in the IDEA requires the parents' consent to finalize an IEP. Instead, the IDEA only requires that parents have an opportunity to participate in the drafting process. It is also important to note that, aside from A.E.'s placement at CES, the parents' proposed IEP was substantially similar to the IEP as revised on June 22, when many of the parents' suggestions were adopted.

Additionally, the hearing officer explicitly considered whether the Board predetermined A.E.'s placement at CES. She reasoned, "[w]ith regard to the issue of a Board making a final decision in advance of a PPT, the danger sought to be avoided is the parent's preclusion from meaningful participation in the decision making process as required by IDEA." Hearing Officer's Decision and Order of March 17, 2005, p. 11, ¶ 9. The hearing officer explained that a difference exists between being "open-minded" and being "blank-minded." *Id*. "While a school system must not finalize its placement decision before an IEP meeting, it can, and should, have given some thought to that placement." *Id*. (citing *Doyle v. Arlington County School Board*, 806 F. Supp. 1253, 1262 (E.D. Va. 1992)). The Board had properly given thought to A.E.'s placement during its preparation for the June 8, 2004 PPT meeting, as evidenced by its suggestion that A.E.'s parents look at several schools, including Hall Brooke (Seton Academy)

and Cedarhurst Academy, in addition to CES. There is no evidence other than the recommended placement itself, however, that the Board had made a binding predetermination that A.E. would attend CES, and there is no reason to overturn the hearing officer's ruling on those grounds.[1]

Finally, as a general matter, the Board did not deprive A.E.'s parents of a meaningful opportunity to participate in the process. A.E.'s parents participated extensively in their child's school placement. They attended all PPT meetings, including the June 8 and June 22 meetings. They sought out, and were represented by, a qualified parent advocate. They corresponded with the Board multiple times throughout the process. They submitted letters, recommendations, and proposed IEPs. They suggested changes to the minutes of the PPT meetings. They had the child independently evaluated. They recommended, and fervently campaigned for, placement of A.E. at Woodhouse Academy, the school they believed would provide their child the best possible education.

      B.      <u>Was A.E.'s IEP Reasonably Calculated to Enable Him to Receive an Educational Benefit?</u>

Under the IDEA, "each local educational agency, State educational agency, or other State agency . . . shall have in effect, for each child with a disability in the agency's jurisdiction, an individualized education program," which may include a recommended placement of the child. 20 U.S.C. § 1414(d)(2)(A). The hearing officer held that "[t]he Board has the burden of proof on

---

[1] By contrast, A.E.'s parents had clearly determined that Woodhouse Academy was the appropriate placement for A.E. before the June 8 meeting to discuss placement. In fact, the parents indicated in a letter dated May 28, 2004 that Woodhouse Academy was the only acceptable placement for A.E.

the appropriateness of the program . . . as well as the placement."[2]  Hearing Officer's Final

Decision and Order of March 17, 2005, p. 9 ¶ 2.  "Placement in a private facility shall be made

only when the board of education has fully explored all possible public placements."  Regs.,

Conn. State Agencies § 10-76d-16(a)(3).

It is well-established that a school district complies with IDEA's substantive requirements

if a student's IEP "is reasonably calculated to enable the child to receive educational benefits."

*Cerra*, 427 F.3d at 194.  The IDEA, however, does not require a board to furnish every special

service necessary "to maximize each handicapped child's potential."  *Id*. at 195.  Moreover, "the

best educational outcomes are not required by the IDEA."  *Pascarella*, 153 F. Supp. 2d at 153.  A

school need not "provide the optimal level of services, or even a level that would confer

additional benefits."  *Cerra*, 427 F.3d at 195.  The IDEA requires only that student receive a

"basic floor of opportunity."  *Id*.  A school district will fulfill its substantive obligations under the

IDEA if the student is likely to make progress, not regress, under his IEP, and if the IEP affords

the student with an opportunity "greater than mere trivial advancement."  *Id*.

The standard of review of an IEP's substantive adequacy is deferential.  When reviewing

---

[2] The hearing officer issued her decision on March 17, 2005.  Eight months later, on November 14, 2005, the United States Supreme Court decided *Schaffer v. Weast*, 126 S. Ct. 528 (2005).  The *Schaffer* Court set forth a default rule that "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief," which, in this case, was the plaintiff.  *Id*. at 537.  The *Schaffer* court, however, expressly declined to decide whether "states may . . . override the default rule and put the burden always on the school district."  *Id*.  The Regulations of Connecticut State Agencies § 10-76h-14 provides that "[t]he party who filed for due process has the burden of going forward with the evidence.  In all cases, however, the public agency has the burden of proving the appropriateness of the child's program or placement, or of the program or placement proposed by the public agency."  *Id*.  The Second Circuit has yet to determine whether the Regulations of Connecticut State Agencies § 10-76h-14 survived *Schaffer*.  Still, A.E. can hardly complain that the hearing officer placed the burden on the Board at the due process hearing.

a hearing officer's decision, courts must "avoid impermissibly meddling in state educational methodology" and "examine the record for any objective evidence that indicates whether the child is likely to make progress or regress under the proposed plan." *Id*. Courts should pay particular deference to state administrative agencies when assessing an IEP's substantive adequacy because state agencies "have special expertise in making judgments concerning student progress." *Id*.; *see M.S. v. Yonkers Bd. of Educ.*, 231 F.3d 96, 102 (2d Cir. 2000). ("An assessment of educational progress is a type of judgment for which the district court should defer to the SRO's educational experience, particularly where . . . the district court's decision was based solely on the record that was before the SRO."). The Second Circuit has cautioned that it has "not hesitated to vacate district court opinions where the district court erred in substituting its judgment for that of the agency experts and the hearing officer." *Id*.

The narrow and most significant question presented here is whether A.E. would have received an "educational benefit" at CES as that term is defined in the IDEA.[3] Plaintiff essentially argues that CES is not appropriate because: (1) CES' behavioral management policies and point-and-level systems are more punitive than preventative, and thus A.E. would regress; (2) CES places more emphasis on behavioral management than on academic development; and (3) CES' teachers, although special education certified, are not general education teachers.

At the administrative hearing, A.E.'s parents relied primarily upon the testimony of three

---

[3] Although plaintiff also argues that the hearing officer never explicitly found placement at CES to be appropriate, that assertion is inaccurate and misleading. In her ruling, the hearing officer described the student's background and educational needs, outlined the relevant potions of CES therapeutic program, and explicitly found that "[t]he student was offered a FAPE in the LRE in the June 8 IEP, as modified on June 22, 2004, with the recommended placement at CES for the 2004-2005 school year." Hearing Officer's Decision and Order of March 17, 2005, p. 9 ¶ 2.

experts. The parents first presented Dr. Armin Thies, a neuropsychologist. Dr. Thies had examined A.E. two years earlier, but since then had no direct contact with A.E. Tr. 10/20/04 at 106. A.E. has a very low frustration tolerance and thus his frustration "quickly . . . evolves into emotional arousal." *Id*. When A.E. is emotionally aroused he loses his self control "act[s] out without much modulation of his emotion or without much control in terms of his social appropriateness of his behavior." *Id*. at 89. Because he loses control after he becomes emotionally aroused, Dr. Thies reasoned that A.E. should be placed in a "smaller environment" with a "smaller student to teacher ratio" so his teachers could be more "proactive in terms of preventing the building of frustration" before he acts out. *Id*. Dr. Thies commented that a punitive system would not be effective because it would be more likely to "generate conflict" than modify behavior. *Id*. at 90. Dr. Thies concluded that "a wide variety of children" can be successful at CES, but "for A.E., I would have concerns about how he would react in terms of [CES'] imposition of limits." *Id*. at 126. Specifically, Dr. Thies was concerned that CES could not sufficiently modify its point-based behavior system to have a "benign effect" on A.E. *Id*. at 129.

The parents also relied on Dr. Marcia Eckerd's testimony. Dr. Eckerd, a clinical psychologist, had observed A.E. on several occasions at social skills group sessions, had visited CES for three hours, and had reviewed reports prepared by Dr. Thies, Dr. Papolos, and Dr. Gammon. Tr. 10/21/04 at 6-7, 11-12. Dr. Eckerd commented that A.E. has "difficulty with self control," "difficulty reading situations with other people," and "difficulty in terms of his capacity to respond to situations" as he perceives them. *Id*. at 7. Dr. Eckerd also commented that A.E.'s memory functions are not deficient, but he is not able to use those functions "at a moment when

he is emotionally agitated." *Id*. at 9.  Therefore, a system of punishment would be ineffective because "the anticipation of consequences does not really impact his behavior." *Id*.  Dr. Eckerd commented that a rigid behavioral management system would not be appropriate for A.E. because A.E. "would be able to use the system to calm himself down" and thus "A.E. would experience repeated negative consequences." *Id*. at 51-52.  Dr. Eckerd also added that a "flexible response system" would not be effective because A.E. sees the world in "black and white" and would perceive the differential responses "as unfair because he does not have a more complex understanding of why things might be implemented differently." *Id*. at 53.  Dr. Eckerd ultimately concluded that CES was "not an appropriate educational placement for A.E." *Id*. at 73.

Finally, A.E.'s parents relied on Dr. Demitri Papolos' testimony.  Dr. Papolos, a psychiatrist and director of research for the Juvenile Bipolar Research Foundation, treats A.E.'s bipolar condition.  Dr. Papolos, however, has never visited CES and only knows about the school through second-hand accounts from patients and from reading the CES brochure.  Tr. 10/27/04 at 139.  Dr. Papolos testified that he did not think CES' behavioral management policies would be effective because A.E., when challenged, "will very likely become more disruptive." *Id*. at 145.  He expounded that placing A.E. at CES would lead to "catastrophic behaviors" and that A.E. would "probably refuse to go to school" because he would "be miserable." *Id*.  Moreover, A.E. "wouldn't be able to learn." *Id*.  Dr. Papolos commented that he could "predict easily in advance" that A.E. would not succeed at CES. *Id*.

By contrast, the Board presented testimony from experts who believed CES was an appropriate placement for A.E.  The Board called Dr. George Gammon, a child and adolescent psychiatrist who examined A.E. the previous spring.  Dr. Gammon testified that A.E.'s school

must have "great flexibility and empathy" when addressing A.E.'s behavioral problems and should show "considerable restraint and subtlety" during its interventions.  Tr. 12/17/04 at 20-21.  Dr. Gammon, who is "quite familiar" with CES, commented that CES "is a very good program" that employs skillful staff who have "a fair amount of experience with special education students."  *Id*. at 21, 25.  In fact, Dr. Gammon "often recommends" CES for children who share A.E.'s "complex picture."  *Id*. at 25.  Dr. Gammon ultimately concluded that CES would be an appropriate educational program for A.E. because "the staff are seasoned and they have the range of necessary skills, attributes and experience."  *Id*. at 27.

       The Board also relied on Dr. Daniel French's testimony.  Dr. French, a clinical psychologist and CES' director, testified extensively about the intensive programs CES provides, and about the qualified staff CES employs.  He stressed that intervening early is vital to CES' approach because "most highly disruptive or aggressive behaviors can be traced back to signs early on in the process."  Tr. 12/2/04 at 102.  Dr. French commented that recognizing early signs, such as "fidgeting," can "make a big difference" in reducing problematic behaviors.  *Id*.  CES provides many opportunities a student to "take space" and calm down when he shows the initial signs of problematic behaviors.   The student can "go for a walk in the hallway," or "go down to the gym or fitness room."  *Id*. at 120.  Moreover, each classroom at CES has an area specifically designed for students to "take space" if necessary.  *Id*. at 121.  CES, however, does not require students to take an "exclusionary timeout," or a timeout outside the classroom, unless the IEP specifically recommends such treatment for the child.  *Id*. at 124.  The school thus avoids negatively stigmatizing "timeouts," and instead portrays a timeout as the "most conducive" environment for children to "settle down."  *Id*. at 129.  Based on his knowledge of CES and a

review of several doctor evaluations, Dr. French concluded that "there is a very reasonable expectation for success" for A.E. at CES because CES, in the past, has had substantial success educating other children with "a profile similar to A.E." *Id*. at 138.

The record thus clearly reflects that the parties both presented credible, yet conflicting, expert testimony, and the hearing officer credited the defendant's experts over the plaintiff's experts. The plaintiff now seeks a different outcome to the battle of conflicting expert testimony over a complex issue of educational policy, namely, the education of bipolar children. On multiple occasions, however, the Second Circuit has held that district courts should not overturn a hearing officer's decision based upon its own reassessment of conflicting expert testimony. *See, e.g., Grim v. Rhinebeck Central School District*, 346 F.3d 377, 383 (2d Cir. 2003) ("In violation of *Rowley*, the District Court impermissibly chose between the views of conflicting experts on a controversial issue of educational policy . . . in direct contradiction of the opinions of state administrative officers who had heard the same evidence."); *Cabouli v. Chappaqua Central School District*, 2006 U.S. App. LEXIS 27016, *6-*7 (2d Cir. 2006) (holding that although some expert testimony adduced at the due process hearing conflicted, the district court "should not have chosen between the conflicting views of experts against the opinions of state administrative officers who heard the same evidence.").

Moreover, the hearing officer's decision was reasonable. The plaintiff's experts may have been more familiar with the child. The Board's experts, however, were certainly more familiar with CES' program. In this case, the primary area of disagreement between the respective experts was not the diagnosis of the child's condition, but instead was the degree to which CES was sufficiently flexible to provide appropriate behavioral intervention and

educational programs catered to A.E.'s particularized needs.  On that specific point, the Board's experts were far more knowledgeable.  Additionally, because 25 of the 115 students at CES are diagnosed bipolar, the school is capable of educating students who have disorders similar to A.E.'s.  In short, the record fully supports the hearing officer's decision that CES provided A.E. a FAPE.

     A.E.'s parents, understandably, did what they thought was best for their child, they sent A.E. to Woodhouse Academy.  A.E. reportedly achieved success at Woodhouse and has since transferred to a new school where he is also doing well.   It would thus appear that A.E.'s parents, in fact, made a good decision.  Indeed, private schooling is the ideal educational setting to maximize the potential of many children.  The IDEA, however, does not require a school district to pay for a private school education simply because that opportunity would be ideal for the student.  It requires only that a school board provide each student a FAPE, that is, a basic opportunity to receive an educational benefit.  Because A.E. would have received that basic opportunity at CES, the Board is not required to reimburse the parents for the cost of what may have been an even better educational opportunity for A.E.

**IV.**     **Conclusion**

For the foregoing reasons, A.E.'s Motion for Judgment on the Administrative Record (doc. # 34) is DENIED and the Westport Board of Education's Motion for Judgment on the Administrative Record (doc. #38) is GRANTED.  The clerk shall close the file.

It is so ordered.

Dated at Bridgeport, Connecticut, this 29th day of November 2006.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge